# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### October 27, 2009 Session

## STATE OF TENNESSEE v. MARK ALAN DEAKINS

**Appeal from the Criminal Court for Hamilton County**
**No. 223635     Don W. Poole, Judge**

---

**No. E2008-02761-CCA-R3-CD - Filed January 11, 2010**

---

The defendant, Mark Alan Deakins, appeals the revocation of his probation, claiming that the State failed to establish a probation violation by substantial evidence. Because the record establishes that the defendant violated the terms of his probationary sentence, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JOHN EVERETT WILLIAMS, J., joined.

Benjamin L. McGowan, Chattanooga, Tennessee, for the appellant, Mark Alan Deakins.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; William H. Cox III, District Attorney General; and Leslie Longshore and Lance Pope, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

On July 8, 2002, the defendant, originally charged with 23 counts of especially aggravated sexual exploitation of a minor, seven counts of sexual exploitation of a minor, four counts of sexual battery, and two counts of statutory rape, entered pleas of guilty to one count of especially aggravated sexual exploitation of a minor, one count of sexual exploitation of a minor, and one count of statutory rape. Pursuant to a plea agreement with the State, the defendant received an effective sentence of nine years to be served as one year in jail followed by supervised probation. The remaining charges were dismissed. As a condition of his probation, the defendant was required to register as a sex offender and follow the sex offender guidelines. The judgments specifically provided that the defendant was to have "no unsupervised contact with minors."

In August 2004 and July 2007, the defendant tried unsuccessfully to have the terms of his probationary sentence modified. Then, in April 2008, the defendant again filed a motion to "modify, remove or release from conditions of probation." On the day that the defendant appeared to argue his motion, he was arrested on new charges of rape of a child and aggravated sexual battery. His motion to modify the conditions of his probation was "stricken" and his case continued.

On May 14, 2008, a probation violation warrant issued for the defendant's remaining eight year sentence[1] alleging that the defendant had violated the terms of his probation by incurring new arrests for rape of a child and aggravated sexual battery, by having unsupervised contact with the minor victim of the new charges, and by engaging in "assaultive, abusive, threatening or intimidating behavior." An addendum to the original violation warrant added allegations that the defendant had obtained internet access and maintained a residence not approved by his probation officer in violation of the sex offender guidelines.

At the revocation hearing, the State acknowledged that it had dismissed the indictment charging the defendant with two counts of rape of a child and one count of aggravated sexual battery because it "did not believe that [there was] sufficient evidence to prove to a jury beyond a reasonable doubt that [the defendant] had in fact committed these crimes." Nevertheless, the State maintained that under the less stringent burden of proof required for probation revocation, substantial evidence existed from which the court could conclude that the defendant had raped and sexually assaulted the minor victim, B.A.[2]

Thirteen-year-old B.A. testified that he met the defendant in 2006 when he and his sister offered to help the defendant remodel the house next to the one where the victim lived with his mother and sister. Thereafter, the victim worked for the defendant "a lot," helping him to remodel at least seven houses over a period of "[a] couple of months." The victim testified that he would either telephone the defendant or send him a text message indicating his availability to work. The defendant would then pick the victim up at the victim's house and drive him to the work location. The victim testified that when he worked for the defendant they were generally alone together. The victim stated that he sometimes went to the defendant's house so that the defendant could pick up tools or change clothes. He recalled that the defendant lived in a house on Culver Street in Red Bank, where he kept "[c]ouches, TV, computers . . . . [a] lot of furniture, entertainment center, his clothes." The

---

[1]The defendant's one-year sentence for statutory rape and two-year sentence for sexual exploitation of a minor had expired by the filing of the probation violation warrant.

[2]It is the policy of this court to refer to the minor victims of sexual crimes by initials only.

victim testified that the defendant used the five computers located in this Red Bank residence to access the internet to play games and get on "MySpace."

The victim stated that during one of his visits to the defendant's Culver Street residence, the defendant placed pillows on the floor and directed the victim to lie on the pillows. The defendant then retrieved some lotion from his bedroom and used it to give the victim a massage. The victim testified that the defendant pulled the victim's pants down and tried to place his penis inside the victim's anus. When he could not successfully penetrate the victim, the defendant "went in the bathroom and he told [the victim] to come in the bathroom, then he put [the victim] in the bathroom and got the waterhose head and he stuck that up [the victim], he said this ought to loosen you up." The victim stated that the defendant never achieved successful penile-anal penetration on that occasion.

On a second occasion at the defendant's Culver Street address, the victim was playing a game on the defendant's computer when the defendant asked the victim to sit on his lap while the defendant viewed a pornographic website. After the defendant finished viewing the site, he told the victim to stand up and pull his pants down. When the victim refused, the defendant rubbed his back, pulled his pants down, and told him to "just relax, you'll like it." The victim testified that the defendant "put some lotion on" both himself and the victim and again attempted to penetrate the victim's anus with his penis. When he was unsuccessful, the defendant pulled his pants back up and took the victim home.

The victim testified that he helped the defendant move into an apartment in Red Bank that was located only a short distance from the Culver Street residence. The victim stated that he was playing a game on the defendant's computer when the defendant came to help him play the game. The victim described what happened next: "Then he went . . . in his room, then he got some lotion, then he said stand up, then he put me on his leg, then he pulled down his pants and said let me see your magic." The victim recalled that the defendant also told the victim to "suck him." When the victim refused, the defendant "put some lotion in his hand and rubbed it on [the victim], then put it on him[self] and he tried to sit [the victim] on his lap."

On a second occasion at the Red Bank apartment, the defendant showed the victim "a website with boys on it, then . . . got horny" and told the victim to come into his room and lie on the bed. The defendant then put lotion on his penis and again "tried to rape" the victim. The victim recalled telling the defendant that his "butt was bleeding," and the defendant "said it will be all right." The defendant told the victim to take a shower and then drove him home.

On another occasion at the defendant's Red Bank apartment, the defendant showed the victim a pornographic magazine featuring "boys" before taking the victim to his

-3-

room, ordering the victim onto the bed, and penetrating the victim's anus with his penis. The victim testified that following the rape, he took a shower, and the defendant drove him to Target and bought him "a PSP."[3]  He said that in addition to the gifts that the defendant purchased for the victim, the defendant loaned money to the victim's mother.

The victim stated that he eventually reported the sexual assaults to his sister on September 21, 2007.

The victim admitted sending a text message to the defendant on September 17, 2007, demanding a go-cart.  He also admitted that he sent another text message to the defendant threatening to "snitch" if the defendant did not provide him with a go-cart "[b]y Friday."  The victim explained, "[W]e was going to build a go-cart first, then he said that will take too long, so he said he would get one.  And I told him if he didn't get it, I was going to tell what he was doing."  The victim also admitted asking the assistant district attorney if his case was "a suing case," claiming that he did so only because he was curious.  Despite these admissions, the victim insisted that he chose to report the abuse on September 21, 2007, only because he "couldn't hold it no more."  He specifically denied manufacturing the claims so that the defendant would give him a go-cart.

During cross-examination, the victim testified that he helped the defendant move to the Culver Street residence during the summer of 2007 and that he told representatives from the Children's Advocacy Center the defendant raped him at the Culver Street residence on July 6, 2007. After first saying that the defendant had only raped him one time and that the rape happened at the defendant's Red Bank apartment, the victim then testified that the defendant raped him the first time at the Culver Street address on July 6, 2007.  The victim denied that the defendant sexually assaulted him at a residence on Glass Street.  He said that the interviewing officer who reported that simply "got it wrong."

The victim admitted sending text messages to the defendant as late as August 31, 2007, asking for the loan of a car and for extra work.  He also admitted working for the defendant during September 2007.  The victim conceded that he lied to Stacy Cook of the Children's Advocacy Center when he told her that he last saw the defendant on August 10, 2007.  The victim insisted that he had helped the defendant move from his Culver Street residence in the summer of 2007 but nevertheless stated that he was not surprised to learn that the defendant's lease had expired on the Culver Street residence in April 2007.

The victim admitted that the defendant told him that they could not be alone together because the defendant would get into trouble and that two other employees, "Lee

---

[3] PlayStation® Portable, a handheld video gaming device manufactured by Sony. *See* PlayStation PSP, http://www.us.playstation.com/PSP (last visited on Dec. 10, 2009).

and Sunday," often worked with the two of them. The victim also acknowledged that he had repeatedly asked the defendant for gifts and financial assistance for his mother and sister. He also conceded that he had contemplated pursuing a lawsuit against the defendant.

On redirect examination, the victim admitted that he could be mistaken about the dates of the sexual assaults, but he maintained that the defendant had sexually assaulted him "[a] lot."

The victim's mother, Sharon Owens, testified that the victim worked for the defendant "all the time" and that another man worked with them. She stated that the defendant would pick the victim up and bring him home on each of the days that they worked together. She said that the victim worked for the defendant for approximately a year and a half and that she was unaware during that time that the defendant was a registered sex offender. Ms. Owens stated that the defendant once provided her $50 to pay her electric bill and $125 to pay a college fee for her daughter.

During cross-examination, Ms. Owens admitted that she never had any concerns about the victim's working for the defendant and conceded that she never observed any inappropriate contact between the two.

Tennessee Board of Probation and Parole Manager Floyd Owsley testified that he supervised the defendant's probation from November 2002 through June 2004 and from December 2006 through May 2008. Mr. Owsley stated that the defendant reported as required and that Mr. Owsley conducted several home visits at three different residences listed by the defendant. Two were located in Soddy Daisy and one was in East Chattanooga. Mr. Owsley confirmed that the defendant had a good employment history and that beginning in August 2004 the defendant claimed to be working for himself "and Star Properties, and he claimed 221 Culver Street in Chattanooga" as his employment address. In April 2007, the defendant changed his employment address to "post office box 17111." Mr. Owsley testified that he never visited the Culver Street address and confirmed that it would have been a violation of the defendant's probation to maintain more than one residence. Mr. Owsley stated that the defendant never registered a residence in Red Bank.

Mr. Owsley testified that the defendant read and signed the "sex offender special conditions," which he described as "the specialized probation conditions for sex offenders." He stated that the defendant never asked permission for internet access, which was one of the special conditions. He recalled that he had seen "what appeared to be a computer" in the defendant's East Chattanooga residence, but the defendant claimed that "it was an empty box, that it wasn't really . . . a computer." Mr. Owsley stated that possession of a computer would not have violated the defendant's probation but access to the internet

without permission would. He testified that the defendant was not permitted to have pornography on his computer.

Mr. Owsley testified that as part of the special conditions of his probation, the defendant was to have no unsupervised contact with minors. In addition, all supervised contact had to be approved by either Mr. Owsley or the defendant's treatment provider, and "there has to be a chaperone approved." Mr. Owsley stated that the defendant was made aware of this condition when he read and signed the sex offender conditions in 2006. Mr. Owsley testified that the defendant never reported his contact with B.A., never asked to be assigned a chaperone, and never asked permission to have contact with any minor. He said that the defendant's having any contact with the victim without permission and without an approved chaperone would have been a violation of the defendant's probation.

During cross-examination, Mr. Owsley agreed that he had only the information from B.A. upon which to base the violation report. Mr. Owsley acknowledged that the defendant had successfully completed sex offender treatment, had paid all of his probation fees, had passed all his drug tests, and had reported as scheduled. Mr. Owsley admitted that it would not be a violation of the terms of his probation for the defendant to pay rent on a residence and allow others to live in it so long as he did not spend the night there himself. He admitted that other than the victim's testimony, he had no proof that the defendant had internet access, had viewed pornographic websites, or had lived anywhere other than the addresses the defendant reported on his sex offender registration.

The defendant testified that he had complied with the conditions of his probation for the seven years before he was incarcerated on charges for sexually assaulting the victim. He said that he came to know the victim while he was performing remodeling work on a residence next to the victim's residence. The defendant stated that the victim first approached employees of the defendant and then eventually began working for the defendant doing "mowing or weedeating or maybe painting, just miscellaneous, you know, minor stuff." He said that the victim had worked for him on approximately ten occasions "over the years."

The defendant adamantly denied having sexual contact with the victim. He admitted that he was aware he was to have no unsupervised contact with minors and stated that to comply with this rule he was never "in the presence of anyone under 18 years of old without, you know, somebody around." He stated that he was never alone with the victim and that his employees supervised any contact he had with the victim. The defendant testified that he told the victim that they could not be alone together because the defendant was on probation and that the victim became aware that the defendant was a registered sex offender when the victim found his registration card. He stated that he did not know that he

was required to get an approved chaperone to supervise his contact with the victim because the judgment in his case said only "no unsupervised contact with minors."

The defendant denied having internet access and stated that he had the computer, which lacked a hard drive, that Mr. Owsley had observed because he was hoping to "function [his] business relatively easy out of [his] residence." He stated that he offered to allow Mr. Owsley to examine the computer, but Mr. Owsley declined. The defendant testified that he did not actually reside at the Culver Street address but had rented the house to store tools, extra vehicles, and allow employees temporary housing. He stated that he informed his former probation officer, Cathy Di Chiacchio, of the arrangement and that she had approved it. The defendant admitted spending one night at the Culver Street residence because he "got home from work, it was like 3:00 in the morning, and crashed on the couch." He testified that three different employees resided in the Culver Street address over the life of the lease. He stated that his lease expired on March 30, 2007, and that he had no access to the property after that date. The defendant could only recall the victim's going to the Culver Street address one time to retrieve a lawn mower.

The defendant stated that the victim last worked for him on August 31, 2007, and that he had "just disappeared" from the work site. The defendant testified that at that point he had decided that he would no longer allow the victim to work for him. He recalled that he received a text message on the following day from the victim's number saying that the victim was sorry and wanted to return to work. The defendant recalled that he had no contact with the victim until September 17, 2007, when the victim sent a text message demanding a go-cart. He said that he felt threatened when the victim sent a message saying that he would "snitch" unless the defendant gave him a go-cart. He stated that at that point he believed that the victim would tell the other employees that he was being paid more per hour than they were and that he had no idea the victim would accuse him of sexual assault.

The defendant testified that he did what he could to help the victim and his family by providing them money, food, and gifts. He explained, "[I]t was a poor family, they were on Section 8, the church got most of their food for them, the mother was in and out of temporary jobs. . . . I'd get phone calls they didn't have anything to eat . . . . Gifts . . . usually didn't stay there long, they were in the pawnshop." He said that "a week or two prior to" the victim's last day of work, the victim's mother had asked the defendant for "like 1500 bucks" to repair her car and that he had "turned her down" because "it wasn't feasible and [he] began to feel used."

During cross-examination, the defendant admitted signing a set of guidelines when first released on probation in 2002 that included the following condition:

You shall not be in the company of any child under the age of 18 unless an adult is present who has knowledge of your history of criminal sexual behavior and/or abusive behavior and have been approved in writing as a chaperone by your officer. You must report all incidental contact with children to the treatment provider and your officer as required by your officer's supervisor.

He also admitted signing a second set of guidelines in 2006 that included the following condition:

I will not enter into contact with any child under 18 or anyone who is unable to give consent due to mental, physical or emotional limitations, unless an adult is present who my officer and my treatment provider has approved in advance in writing as a chaperone. I will report all incidental contact with children to the treatment provider and my officer. . . .

The defendant stated that he "questioned the ability of [the no-contact provision] to be functionable" and that the provision "was clarified to [him] that the contact meant a different thing." He said that he did not think, based on his understanding of the provision, that he was required to report his contact with the victim because he was never alone with the victim. He stated that he believed that the presence of his other employees was sufficient to fulfill the supervision requirement of the no-contact provision.

The defendant admitted that a computer located at the Culver Street address did have internet access, but he stated that only his employee, Joe Culbert, had access to the computer and that the computer was only used for business purposes. He said that the internet account was under the name of his business partner Steve Huggins. The defendant denied ever using the computer to access the internet. The defendant admitted renting "three or four" units at the Northern Hills Apartment Complex for his employees to use at different points.

The defendant admitted that the victim sent him text messages but stated that he did not know how the victim had gotten his telephone number. He acknowledged that he programmed the victim's cellular telephone number into his own cellular telephone. He also conceded having telephone conversations with the victim that may not have been supervised.

During examination by the court, the defendant acknowledged that he kept some personal furniture at the Culver Street address to "save storage bills" and to be "used by the people that stayed there." He stated that he moved some furniture into a storage unit

at the Northern Hills Apartment Complex. He testified that he received work orders via email and that one of his employees would print the order and give it to him because he was "not allowed to have the internet." The defendant stated that he reported the internet access to his probation officer.

At the conclusion of the hearing, the trial court concluded that the State had established by "overwhelming evidence" that the defendant violated his probation "by being in contact with [B.A.] for an extended period of time, 2006, 2007, certainly in 2007." The court also concluded that the victim was "not a good witness" but nevertheless deemed "his allegations as to what happened with [the defendant] to be very credible." In contrast, the court found the defendant's testimony "not to be worthy of belief." The trial court found "by a preponderance of the evidence that [the defendant] did have a computer with internet access" and that "he used that internet access to show inappropriate images to this . . . youngster," both in violation of the terms of the defendant's probation. In addition, the court concluded that the defendant used the Culver Street address as a secondary residence in violation of his probation. Finally, the court found "by a preponderance of the evidence" that the defendant "on two occasions . . . did in fact inappropriately touch him, inappropriately attempt to rape him." Based on the established violations, the court revoked the defendant's probation and ordered him to serve his sentence in the Department of Correction.

In this appeal, the defendant contends that the trial court erred by revoking his probation on the basis of B.A.'s testimony, which the defendant argues was "so incredible that it cannot reasonably be relied upon." He claims that because "all but a single alleged violation . . . rested solely and completely" on the uncorroborated testimony of the victim, the trial court should not have revoked his probation. The State asserts that the trial court did not err by accrediting the victim's testimony and using that testimony to find violations of the defendant's probation.

We consider the defendant's claims with a few well-settled principles in mind. Upon a finding by a preponderance of the evidence that the defendant has violated the conditions of probation, the trial court may revoke the defendant's probation and "cause the defendant to commence the execution of the judgment as originally entered, or otherwise in accordance with § 40-35-310." T.C.A. § 40-35-311(e) (2006); *see also Stamps v. State*, 614 S.W.2d 71, 73 (Tenn. Crim. App. 1980). Following a revocation, "the original judgment so rendered by the trial judge shall be in full force and effect from the date of the revocation of such suspension." T.C.A. § 40-35-310. The revoking court may extend the period of probation supervision for a period not to exceed two years. *Id.* § 40-35-308(c).

The decision to revoke probation rests within the sound discretion of the trial court, and this court will not disturb the trial court's ruling in the absence of a showing that the trial court abused that discretion. *State v. Shaffer*, 45 S.W.3d 553, 554 (Tenn. 2001)

(citing *State v. Harkins*, 811 S.W.2d 79, 82 (Tenn. 1991)). The trial court, as the trier of fact in a probation revocation hearing, determines the credibility of witnesses. *See generally State v. Mitchell*, 810 S.W.2d 733 (Tenn. Crim. App. 1991); *Carver v. State*, 570 S.W.2d 872 (Tenn. Crim. App. 1978). The trial court also retains the discretionary authority to order the defendant to serve the original sentence. *See State v. Duke*, 902 S.W.2d 424, 427 (Tenn. Crim. App. 1995). Relief will be granted only when "'the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved.'" *Shaffer*, 45 S.W.3d at 555 (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

In this case, the trial court found the victim's testimony credible and the defendant's testimony "not to be worthy of belief." The defendant points to the victim's seeking work from the defendant following the assaults, his attempts to extort a go-cart from the defendant, and his confusion regarding the dates and locations of the assaults as rendering his testimony incredible. The trial court acknowledged each of these problems with the victim's testimony and nevertheless declared the victim to be a credible witness. The defendant's argument on appeal is simply a retreading of ground already trod by the trial court, who saw and heard the witnesses first hand. In short, he has presented no reason for this court to go behind the trial court's credibility determination in this case, and we decline to do so.

Based upon the accredited testimony of the victim, the defendant spent many unsupervised hours in the company of the minor victim, displayed pornographic websites to the victim from a computer at the Culver Street address, and attempted to rape the victim on two occasions. In addition, the testimony of the victim and the defendant established that the defendant maintained more than one residence in Red Bank while reporting a single residence in Soddy Daisy on his sex offender registration. The defendant's testimony established that a computer located at the Culver Street residence had internet access through an account registered in the name of his former business partner. The defendant's rental of various residences and obtaining internet access under another person's name bespeaks a certain level of subterfuge on his part. The defendant's unsupervised contact with the victim, his internet access, and his maintenance of multiple residences support the revocation of his probation.

Accordingly, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE